## Commonwealth v. $13,997

*Mark A. Sindler, assistant district attorney,* for the Commonwealth.

*Travis L. Kendall,* for claimant.

KELLER, *P.J.,* July 20, 1992—In Criminal Actions 10 and 11 of 1990, Ronald Dante Cera, hereinafter claimant, filed an omnibus pre-trial motion which inter alia included a Rule 324 motion for return of $13,997 U.S. currency that was seized from him following a traffic stop. On April 20, 1990, the Commonwealth filed a petition for forfeiture and condemnation of the same currency. Claimant filed an answer on February 25, 1992. The Commonwealth's answer to claimant's motion for return of seized property was filed July 6, 1990.

Claimant's motion for return and the Commonwealth's petition for forfeiture were consolidated and hearing was held April 20, 1992. Counsel have submitted proposed findings of fact, discussion and conclusions of law and the matter is now ripe for disposition.

## FINDINGS OF FACT

(1) On December 11, 1989, Pennsylvania State Troopers Blackburn, Smith and Forre stopped a white Cadillac in Taylor Township, Fulton County, at milepost 174, on the Pennsylvania Turnpike eastbound direction for exceeding the posted speed limit.

(2) Claimant was the owner of the vehicle and a passenger, Ms. Terri Geary was driving.

(3) Claimant was unable to produce the registration card for the Cadillac and began to search through his luggage located in the back seat of the vehicle to search for the registration card.

(4) Claimant removed the luggage one piece at a time and opened it on the trunk of the vehicle in the view of Trooper Smith. The first suitcase contained various items of what appeared to be drug paraphernalia.

(5) The second suitcase opened by claimant inter alia contained an overnight shaving kit bag, which contained a large quantity of U.S. currency in $100 bills, $50 bills, $20 bills, $10 bills, $5 bills and $1 bills; later determined to total $13,800 in four different bundles. Also, $197 in cash was taken from his person.

(6) There were 577 bills in the four bundles in the shaving kit, 413 of them were $20 bills, two of the bundles each contained $5,000, the third $3,000 and the fourth $800.

(7) After claimant was placed under arrest the officers seized in addition to the $197 on claimant's person a paper containing various numbers which claimant admitted were in his handwriting.

(8) A forensic scientist with the Pennsylvania State Police Crime Lab at Greensburg, Pennsylvania, testified at a subsequent criminal trial of claimant and Geary, that he had found residue of cocaine on the drug paraphernalia seized at the time of the traffic stop. Both defendants were convicted of possession of drug paraphernalia and cocaine.

(9) Troopers Blackburn and Smith transported claimant and Geary, together with the seized items, to the McConnellsburg State Police Barracks.

(10) Trooper Smith testified that the toilet kit containing the currency was kept separate from the suitcases and other items taken to the McConnellsburg State Police

Barracks, and the toilet kit was set aside when they arrived at the barracks.

(11) Trooper Blackburn talked to Cpt. Charles A. McCreary at the Pennsylvania State Police Academy and received instructions on what to do in handling the money until the corporal could arrive with his drug dog. The instructions included that Trooper Blackburn wash his hands before taking the money from Trooper Smith, and placing it in a bag. He would then wash his hands again and then stuff paper napkins in six other bags.

(12) Cpl. McCreary testified that he instructed the officer not to let the cash come into contact with the drugs until the dog arrived to avoid cross contamination. When he arrived at the McConnellsburg State Police Barracks, he observed a quantity of cash on the desk top and instructed Blackburn on how to prepare the packages and then waited 15 minutes to eliminate any human odor.

(13) After the seven identical brown envelopes were laid out along the wall in the hallway, Cpl. McCreary brought the drug dog Baron in and he began checking the envelopes from left to right—he passed the fourth package and then "whipped around to alert to the package," i.e. bites and scratches it. The fourth envelope contained the currency.

(14) Counsel for claimant stipulated to the qualifications of Cpl. McCreary and the drug dog.

(15) Cpl. McCreary testified that it was possible but improbable that claimant's pushing the money aside after touching the paraphernalia would have caused the dog to give the alert because Baron gave a strong alert showing a strong odor of narcotics.

(16) Cpl. Michael A. Ruda of the Pennsylvania State Police was found to be qualified as an expert in identifying the methods used by individuals in sales of drugs, their record-keeping methods, drug slang and amounts, and the denominations of bills most frequently used.

(17) Cpl. Ruda examined Commonwealth's exhibit 4, a piece of cardboard with numbers and notes on it taken from claimant's pocket at the time of his arrest. He testified that Commonwealth exhibit 4 was a record of drug transactions which revealed amounts of drugs and monies involved, and when the amounts of money were totaled it was $13,800 being the exact sum found in claimant's toilet kit.

(18) Cpl. Ruda also testified that the fact that the majority of the money was in $20 bills and $10 bills was significant because those are the denominations usually used in drug transactions to purchase smaller quantities of cocaine.

(19) Claimant's mother, Marion Cera, died May 2, 1988, and her last will and testament was admitted to probate in Union County, New Jersey, on May 17, 1988. She bequeathed her entire estate to her sons, Lawrence Cera, Brian Cera and Ronald Cera.

(20) Lawrence Cera was appointed executor of the estate of Marion Cera. The net value of the estate of the decedent was $202,377.95 as reported to the New Jersey Department of the Treasury Division of Taxation.

(21) The executor, Lawrence Cera, produced the following checks evidencing distributions made to claimant from the estate of Marion Cera totaling $3,790:

    (a)   May 27, 1988—$1,500 (Defendant's exhibit 4)

    (b)   June 17, 1988—$1,300 (Defendant's exhibit 5)

(c)   September 16, 1988—$990 (Defendant's exhibit 6)

(22)   He also testified that at the time of the sale of his mother's home, the lawyers handling the settlement distributed one-third of the net proceeds to each brother. He produced check No. 5468 of Dreier & Dreier, attorneys trust account, made payable to Ronald Cera in the amount of $51,095.54 and dated August 11, 1989.

(23)   In addition to the total of $54,885.54 distributed by checks as above set forth, the executor testified that he had made cash distributions and believed the total amount of checks and cash distributed to claimant from the estate was about $61,000 to $62,000. He also testified that he did not know what claimant had done with his share of the distributed estate.

(24)   Brian Conrad Cera testified that he and claimant had during the time of the administration of their mother's estate discussed buying real estate in California and Pennsylvania. The plan to purchase a two-family home was dropped and he purchased his own home in October 1989.

(25)   Brian Conrad Cera testified that he knew claimant had paid back bills including medical bills, and spent money on living expenses.

(26)   Claimant testified to receiving approximately $60,000 from his mother's estate; that he spent money paying back outstanding bills totalling tens of thousands of dollars, and for living expenses. He was not employed.

(27)   Claimant testified that he had made a $20,000 down payment on a house with Ramos Real Estate, but the realtor refunded the $20,000 down payment some time around September or October 1989. On cross-examination he corrected himself and testified that he got

the money from the realtor prior to September 1989. He then cashed the $20,000 refund check and received the $20,000 in small denominations, which he counted out and packaged and used for living expenses. The $13,800 found in the toilet kit he testified was what remained of the $20,000 down payment, and he had taken that money with him to Pennsylvania to make a down payment on a house for himself and his fiancee, Ms. Geary.

(28) We do not find claimant's testimony that he converted $20,000 into small denomination bills; that the small denomination bills contaminated with cocaine had been received by him in September 1989 or earlier from a bank.

(29) Claimant offered no evidence of the real estate transaction and the returned $20,000 down payment.

(30). The currency found in claimant's toilet kit and on his person was money used or intended to be used to facilitate violation of the Controlled Substance, Drug, Device and Cosmetic Act of the Commonwealth of Pennsylvania.

## DISCUSSION

Property subject to forfeiture is:

"(A) Money, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of the Controlled Substance, Drug, Device and Cosmetic Act, and all proceeds traceable to such an exchange.

"(B) Money, negotiable instruments, securities, or other things of value used or intended to be used to facilitate any violation of the Controlled Substance, Drug, Device

and Cosmetic Act." Act of 1988, June 30, P.L. 464 No. 79 §4, 42 Pa.C.S. §6801.

In a forfeiture proceeding the Commonwealth has the burden of proving by a preponderance of the evidence that the currency was derived from illicit drug transactions. *Commonwealth v. Tate*, 371 Pa. Super. 611, 538 A.2d 903 (1988).

In *Commonwealth v. Giffin*, 407 Pa. Super. 15, 21, 595 A.2d 101 (1991), the Superior Court held:

"Where currency is found in close proximity to controlled substances which are unlawfully possessed, such currency is rebuttably presumed to be proceeds deriving from selling a controlled substance in violation of the Controlled Substance Act. 42 Pa.C.S §6801(a)(6)(ii). In *Commonwealth v. Tate*, a case decided under the prior forfeiture statute, a panel of this court stated that a rebuttable presumption is a means by which a rule of substantive law is invoked to force the trier of fact to reach a given conclusion, once the facts constituting its hypothesis have been established. *Id.*, 371 Pa. Super. 611, 616-17, 538 A.2d 903, 906 (1988), quoting *Commonwealth v. Shaffer*, 447 Pa. 91, 104-06, 288 A.2d 727, 735 (1972), *cert. denied*, 409 U.S. 867, 93 S.Ct. 164, 34 L.Ed.2d 116 (1972). The *Tate* court further explained that '[a] rebuttable presumption forces the defendant to come forth or suffer inevitable defeat on the issue in controversy.' *Id.* The specific test used to evaluate the evidence presented at a forfeiture hearing is whether it was 'more likely than not' that the funds were used or intended to be used to facilitate a violation of the Controlled Substance Act." *Commonwealth v. One 1988 Ford Coupe*, 393 Pa. Super. at 333, 574 A.2d at 638 (1990).

In our judgment the evidence in the case at bar, and specifically the evidence that the currency was found in claimant's toilet kit in a suitcase which contained a propane tank, the suitcase was adjacent to one or more other suitcases which contained items determined to be drug paraphernalia with cocaine residue on them, and the drug detection dog alerted to the one envelope of seven identical envelopes which contained the currency, sustained the Commonwealth's burden of proof that the money was used or intended to be used to facilitate a violation of the Controlled Substance Act.

The burden then shifted to claimant to show that:

(1) the claimant was the owner of the property or the holder of a chattel mortgage or contract of conditional sale thereon;

(2) the claimant lawfully acquired the property; and

(3) the property was not unlawfully used or possessed by him.

If the property is unlawfully used or possessed by a person other than the claimant, then the claimant shall show that the unlawful use or possession was without his knowledge or consent. Such absence of knowledge or consent must be reasonable under the circumstances presented. 42 Pa.C.S §6802(j).

We do not find claimant has sustained the requisite burden of proof required.

## CONCLUSIONS OF LAW

(1)  Ronald Dante Cera owned $13,997 in cash.

(2)  The Commonwealth established by a preponderance of the evidence that the $13,997 was used or intended

to be used to facilitate a violation of the Controlled Substance Drug, Device and Cosmetic Act.

(3) Claimant failed to show that he lawfully acquired the $13,997.

(4) The $13,997 is subject to forfeiture to the Commonwealth of Pennsylvania.

## ORDER OF COURT

Now, July 20, 1992, it is ordered and decreed that the $13,997 in U.S. currency seized from Ronald Dante Cera on December 11, 1989, is forfeited to the Commonwealth of Pennsylvania for distribution and use pursuant to the provisions of the Controlled Substances Forfeiture Act. It is further ordered that all legal right, title and interest presently existing in said currency by Ronald Dante Cera or any other person is declared null and void.

Exceptions are granted Ronald Dante Cera.